## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 26 2018, 8:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Renee M. Ortega
Lake County Juvenile Public Defender's Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: S.K., Minor Child,<br><br>D.K., Father<br><br>*Appellant-Respondent*,<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner*. | November 26, 2018<br><br>Court of Appeals Case No. 18A-JT-1508<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Alexis Vazquez Dedelow, Referee<br><br>The Honorable Matthew B. Gruett, Judge Pro Tempore<br><br>Trial Court Cause No. 45D06-1603-JT-89 |

**Brown, Judge.**

[1]     D.K. ("Father") appeals the involuntary termination of his parental rights with respect to his child, S.K. We affirm.

## Facts and Procedural History

[2]     S.K. was born in June 2013 to A.K. ("Mother"). At some point, Father established paternity. On March 17, 2015, the Department of Child Services ("DCS") filed a petition alleging S.K. was a child in need of services ("CHINS") and that S.K. resided with Mother, who was struggling with a drug addiction and had been arrested for possession of a hypodermic needle. The petition also alleged that Mother's home failed to meet sufficient living standards and that DCS took custody of S.K. and removed the child from Mother's care. On July 22, 2015, the court entered an order which found that Father made a general admission that S.K. was a CHINS, granted DCS's petition, and ordered Father to submit to a parenting assessment and follow through with recommended treatment, submit to a substance abuse evaluation and follow through with recommended treatment, and participate in supervised visitation and the Fatherhood Initiative Program.

[3]     On January 20, 2016, the court entered a Review Hearing Order adopting a permanency plan of reunification or termination of parental rights and adoption. The court ordered that DCS was to reinstate services for Father and that it may initiate supervised visitation once Father becomes compliant with the case plan.

[4] On March 23, 2016, DCS filed a Termination of Parental Rights Petition. On April 20, 2016, the court entered a Review Hearing Order adopting a permanency plan of termination of parental rights and adoption. The court ordered DCS to continue to provide reunification services to Father.

[5] On May 17, 2018, the court held a termination hearing.[1] Father expressed a desire to represent himself. The court discussed the dangers and disadvantages of self-representation, allowed Father to represent himself, and appointed an attorney as Father's standby counsel.

[6] April Russ, Father's probation officer since January 2, 2018, when he was sentenced to probation in Porter County for resisting law enforcement as a class A misdemeanor, testified that Father was still on probation in Porter County, that Father was re-arrested and currently incarcerated for new charges in Lake County, and that "we have a hold on him in Porter County with a warrant issued through the court for probation revocation." Transcript Volume II at 15. She stated that Father had a diluted drug screen and subsequently tested positive in January or February 2018 for drugs including amphetamine, methamphetamine, cocaine, marijuana, and Xanax, which was a technical violation of probation, and Father agreed to attend Porter Starke for a substance abuse evaluation and follow through with treatment. She testified that, at a February 2018 administrative hearing, Father admitted the violation and that

---

[1] The court also heard testimony regarding the termination of the parental relationships of Mother and A.W. with respect to their child Al.W.

he "just basically partied." *Id.* at 17. She stated that Father did not follow through with Porter Starke or follow up with her and that Father was arrested at some point in Lake County for possession of a handgun without a permit, a level 5 felony, two counts of intimidation as level 6 felonies, and resisting law enforcement as a class A misdemeanor. She testified that her recommendation would be that once he is released from Lake County Father serve six months in the Porter County Jail in addition to anything Lake County may impose. The court admitted a stipulated plea agreement and order indicating that Father was convicted of auto theft as a class D felony in 2013. After a break, Father's standby counsel indicated to the court that Father asked him to step in as his counsel, and the court appointed him as Father's counsel.

[7] Aimee Christian testified that she was the case manager for S.K. from June or July 2015 until June 2017. When asked how Father did with his substance abuse services, Christian answered:

> He was on and off as well. There was a period, beginning of January of 2016, where he did participate a little more heavily than the other parents and that [sic] he had in the past. He was meeting with his individual therapist. However, he was not meeting with any other service providers. He had met with his parent educator three times. His homebased caseworker, he didn't meet any of those goals. Would not submit to random drug screens, although he did allegedly have random drug screens issued through parole, but he did not present any of those to me.

*Id.* at 104. She testified Father was court ordered to complete a hair follicle test in February 2016, he did not complete the test until June 2016, and the result was positive for cocaine and marijuana. She testified that Father met with his therapist for a period of time but was incarcerated again. She testified Father had visitations, "then there was an issue with showing up to visitations under the influence," they started "instant screening" Father at the beginning of visits to ensure he was not under the influence, three visits had to be cancelled because he was under the influence, and visits were stopped due to Father's non-compliance. *Id.* at 105. When asked if Father ever completed or ever substantially completed the case plan services, Christian answered: "No." *Id.* at 106.

[8] When asked if she recommended adoption as the case plan when she handed over the case, Christian answered affirmatively because "none of the parents have been able to meet the case plan objectives," and "at that point, the case had been open for two years, over two years and we were not making any progress and it was in the best interest of the girls to find some stability and be adopted by people that they know as their caregivers." *Id.* at 112. Christian testified that Father told her he had completed three drug screens through his parole officer but that Father failed to give her the drug screens. She stated she informed Father that he was court ordered to complete two drug screens per week and that he would have to start calling into DCS's drug screen database, but Father failed to do so. She testified that Father's lack of participation

occurred when he was incarcerated and that there were two times where Father was "on the run from the U.S. Marshalls." *Id.* at 121.

[9] Family case manager Jeffrey Tinich ("FCM Tinich") testified that he was assigned the case on October 19, 2017, and that Father's services were suspended at that time for being "in and out of jail, non-compliance, semi-compliance, non-compliance, as well as not achieving the case plan goals." *Id.* at 129. He testified that S.K. had been removed and was in foster care for thirty-eight months, that he could not recommend restarting services and reunification, that it was not in the best interest of S.K. to be prolonged within the system, that parents had not remedied any of the reasons for removal, that it had been at least eighteen months since Mother or Father had seen S.K., and that he was recommending termination of parental rights and adoption. When asked why he recommended termination, FCM Tinich answered: "I'm recommending it . . . in the best interest of these girls. And that's what it comes down to at the end of the day. They deserve permanency . . . a lifestyle of stability[, and] a lifestyle of where they can thrive in an environment without alcohol, drugs, any substance use issues." *Id.* at 133. He indicated that Father was currently incarcerated, was facing charges in Lake County, and regardless of that outcome was going to be sent to Porter County to face probation revocation.

[10] On cross-examination by Father's counsel, FCM Tinich testified that he sent Father mail to which Father did not respond, that Father did not call him after he provided his phone numbers, that he decided to visit Father at the Lake

County Jail on May 4th, and that Father informed him that he was meeting with his therapist one to two times per week.

[11] Father presented the testimony of Jackie Miller, a homebased caseworker who was assigned to the case in July 2016. She testified that she had an initial meeting with Father in July 2016, that she met with Father approximately twelve to fifteen times, that "[s]ometimes he was very engaged, very interested in services, and other times he was not," that she last met with him in October 2016, and that the referral was closed in November 2016 when Father was incarcerated. *Id.* at 160. She described Father as being "[a]pproximately fifty percent compliant." *Id.* at 161. On cross-examination by DCS's counsel, Miller testified that Father never met the goals related to housing and employment.

[12] Father testified that he was an inmate at the Lake County Jail because he was charged with carrying a handgun without a license and resisting law enforcement. He testified that he had been "participating in services throughout all my incarcerations" and was participating in mental health and drug counseling. *Id.* at 165. He testified that he met with his therapist, John Chesser, twice a week, was still participating in drug counseling, had been screened for drugs, and that "it took me awhile to do the hair follicle, but I did it." *Id.* at 167. He testified that he had S.K. "for almost a year straight, approximately eight months" for a period beginning in 2014. *Id.* at 169.

[13] On cross-examination by DCS's counsel, Father testified that the Porter County proceeding resulted from a conviction on January 12, 2018. During cross-examination by the counsel for the court appointed special advocate, Father stated that "the best I've ever done in my life was when [S.K.] was in my life when I came home from prison in 2014" and "[t]hat was the longest stretch I've had without being locked up, that eight months." *Id.* at 173. When counsel asked if not seeing S.K. would have been the ultimate motivator for him at that time, Father answered in part: "You know what, I can't disagree with your fire back there. Yeah, you would think. You would think so." *Id.* at 174.

[14] On May 25, 2018, the court entered an order terminating the parent-child relationship between Mother and Father and S.K.[2] The court's order provides in part:

> [7.[3]] [Father] is currently incarcerated in the Lake County Jail on pending criminal matters concerning handgun charges. . . . [Father] has pending criminal charges in two counties, Lake and Porter Counties in Indiana. [Father] is currently on probation in Porter County and violated probation by testing positive on his drug screens. Father tested positive on his screen with his probation in January/February of 2018, to which the drug test had to be re-administered due to a diluted sample given by [Father]. Father was given services through his probation to assist [him] in becoming drug free. Father was ordered to participate in the Porter Starke Substance Abuse Program, but continued to use illegal substances including cocaine,

---

[2] The order also terminated the parent-child relationships of Mother and A.W. with their child Al.W.

[3] The trial court's order includes handwritten numbers beside the paragraphs.

methamphetamine and Xanax and did not participate in the program. Porter County continues to have a hold on [Father] when he is released from Lake County Jail. [Father] has numerous felony convictions and pending charges. [Father] is very high risk for recidivism.

[8.] Services were offered to [Father] in March of 2015, but he did not participate in the services until January of 2016. [Father] only participated in the case plan in January of 2016, but the only service [Father] participated in was the therapy. [Father] was ordered to complete a hair follicle test, but did not complete the test until June of 2016. [Father's] drug screens were all positive. [Father] would appear at the visitations with his child under the influence. [Father's] visits ceased due to positive drug screens and non-compliance with the case plan. Father has not visited the child since June of 2016. [Father] continued to be in and out of incarceration during the CHINS case. [Father] was ordered to enter inpatient substance abuse treatment in January of 2016, [Father] never completed any such program. [Father] never obtained stable housing and employment. [Father] made minimal efforts in complying with the case plan for reunification.

* * * * *

[12.] None of these parents have maintained stable housing or employment. None of these parents have addressed their substance abuse issues. None of the parents have shown any interest in reunifying with their children. All the parents continue with their criminal activity and substance abuse problems. Even given the multiple opportunities offered to the parents, the parents were not willing to meet their responsibility as parents to confront their substance abuse problems which has stemmed to criminal problems, and correct the dysfunction that precipitated the children's removal in the first place.

* * * * *

[14.] The habitual pattern of each of these parents cannot be ignored. All the parents have been in and out of incarceration since the onset of these cases and both fathers presently are incarcerated. . . . All of the parents have not addressed their substance abuse issues. The Court must look at the best interest of these children and clearly, parents have not remedied the reasons for the involvement of the Department of Child Services or the Court. Neither father is available to care for these children due to their multiple incarcerations . . . . Due to the habitual patterns of conduct displayed by all the parents, there is a substantial probability of future neglect or deprivation of the children.

[15.] No evidence was presented to suggest that anything has changed since the Court entered the March 17, 2015 Order: there is no dispute that the children continue to flourish in their foster home. It would not be in the children's best interests to be taken away from a consistent, stable, family environment to be placed back into a home where the dysfunction and neglect that caused their removal have not been addressed.

[16.] None of the parents are providing any emotional or financial support for the children. No parent has completed any case plan for reunification. No parent is in a position to properly parent these children. No parent can provide for the basic needs of these children. The children are in relative placement and are bonded and thriving. The children have been removed from parental care since March of 2015 and have not been returned to parental care or custody.

[17.] Despite multiple attempts at providing services in an attempt for reunification, the children remain outside of the parents' care. The original allegations of neglect have not been remedied by the parents. None of these parents have demonstrated an ability to independently parent the children and provide necessary care, support and supervision. There is no basis for assuming they will complete the necessary services and find one or all of themselves in a position to receive the children

back into the home.  For over three years, the parents failed to utilize the available services and make the necessary efforts to remedy the conditions, which led to intervention by DCS and the Court.

[18.]  The children continue to reside in a stable foster home with relatives, who have indicated both a willingness and ability to adopt both the children.  It would be unfair to the children to delay such permanency on the very remote likelihood of the parents committing to and completing services.

[19.]  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children in that: for the reasons stated above.  Additionally, the children deserve a loving, caring, safe, stable, and drug free home.

[20.]  It is in the best interest of the [child] and his health, welfare and future that the parent-child relationship between the [child] and his parents be forever fully and absolutely terminated.

[21.]  [DCS] has a satisfactory plan for the care and treatment of the children which is Adoption by the relatives/foster parents . . .

Appellant's Appendix Volume II at 52-54.

## *Discussion*

[15]  The issue is whether the evidence is sufficient to support the termination of Father's parental rights.  In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[16] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the

evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.*

[17] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[18] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement

of S.K. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[19] Father argues that he "did not attend the program to continue to use drugs as the order states but was actually incarcerated before he could attend." Appellant's Brief at 11. He asserts the re-arrest and not a positive drug screen caused his probation violation, he does not have numerous felony convictions, there is no indication that all of his drug screens were positive because he was completing screens through his probation and DCS did not know the results of those screens, and there is no indication from the record that he did not have housing or employment. He argues that the findings do not support the court's conclusions that he could not remedy the conditions that resulted in S.K.'s removal or that termination was in S.K.'s best interests. DCS asserts that Father's arguments are requests to reweigh the evidence, that Father engaged in drug use and criminal activities resulting in his incarcerations and probation violations, and that he failed to consistently participate in services throughout the CHINS proceedings.

[20] In determining whether the conditions that resulted in S.K.'s removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements

against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.*

[21] The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[22] To the extent Father does not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[23] The court found that S.K. was removed from the home in March 2015 and that Father was currently incarcerated in the Lake County Jail on pending criminal charges as well as facing probation violation in Porter County. To the extent Father challenges the trial court's finding that Father continued to use drugs, Father's probation officer testified that Father had a diluted drug screen and subsequently tested positive in January or February 2018 for drugs including amphetamine, methamphetamine, cocaine, marijuana, and Xanax. Christian, the case manager for S.K., testified that Father did not submit to random drug screens for DCS and that Father's June 2016 hair follicle test was positive for cocaine and marijuana. As for the trial court's findings that Father was not compliant with services, we observe that Christian testified that Father showed up to visits under the influence and that visits were stopped due to Father's non-compliance. FCM Tinich testified that Father's services were suspended because Father was in and out of jail and not compliant with services. Father testified that the eight months he had S.K. was the "the longest stretch I've had without being locked up, that eight months," and that he was subsequently incarcerated. Transcript Volume II at 173. Miller testified that Father never met the goals related to housing and employment.

[24] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to S.K.'s removal will not be remedied.

[25]     In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[26]     Christian, the case manager for S.K., testified that "it was in the best interest of the girls to find some stability and be adopted by people that they know as their caregivers." Transcript Volume II at 112. FCM Tinich testified that it was not in the best interest of S.K. to be prolonged within the system and recommended termination of the parent-child relationship because it was in S.K.'s best

interests. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of S.K. is supported by clear and convincing evidence.

## *Conclusion*

[27] We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

[28] Affirmed.

Altice, J., and Tavitas, J., concur.